**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

T-BONE RESTAURANT LLC and STRIP HOUSE :
LAS VEGAS, LLC

               Plaintiffs,    :   Adv. Pro. No. 12-01878 (ALG)

           :

      vs.    :

           :

GENERAL ELECTRIC CAPITAL :
CORPORATION,

           :

          Defendant.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
GENERAL ELECTRIC CAPITAL :
CORPORATION,

           :

          Counter-claim/Third- :
          party Plaintiff,

           :

      vs.    :

T-BONE RESTAURANT LLC and STRIP HOUSE :
LAS VEGAS, LLC,

           :

          Counter-claim :
          Defendants,

           :

   -and-    :

           :

THE GLAZIER GROUP, INC., :

           :

          Third-party :
          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>TRIAL MEMORANDUM OF LAW</u>

     T-Bone Restaurant LLC and Strip House Las Vegas, LLC ("Plaintiffs"), together

with The Glazier Group, Inc. (the "Debtor"), in support of the claims set forth against

General Electric Capital Corporation ("GECC") in the above-captioned action,

respectfully submit this Trial Memorandum of Law, and state as follows:

## INTRODUCTION

The issue in this case is simple and straightforward: is a chapter 11 debtor required to reimburse an oversecured and adequately protected lender for fees and expenses incurred in the pursuit of objectives unrelated to the protection of the lender's secured position? The law is abundantly clear that the answer is "no."

A secured lender is only entitled to the reimbursement of fees and expenses incurred in protecting an objectively jeopardized secured position. In this case, GECC, by its own admission, was adequately protected and vastly oversecured throughout the course of the Debtor's chapter 11 case (the "Chapter 11 Case"). Notwithstanding this fact, the bulk of GECC's expenditures were geared towards an intransigent campaign to force a sale of the collateral securing its loan, and thus terminate its relationship with the Plaintiffs and their co-borrowers. That campaign included deliberately providing false information to the Bankruptcy Court in an effort to engender the Court's support for GECC's scheme to force a sale of the Plaintiffs' assets in order to receive an immediate 100% payout of the GECC loan. The Plaintiffs dispute GECC's right to claim reimbursement for patently excessive fees and expenses incurred in the pursuit of objectives unrelated to the protection of GECC's adequately protected and vastly oversecured loan position.

The analysis below makes clear that GECC knew from inception, and was assured throughout the Chapter 11 Case by series of cash collateral orders, that its oversecured position was adequately protected. Accordingly, fees and expenses incurred by GECC in furtherance of objectives not required to protect GECC's secured position are not reimbursable by the Plaintiffs as a matter of law.

## RELEVANT BACKGROUND HISTORY

**Pre-Petition**

Plaintiffs owned two high-end steakhouses branded as "Strip House" located in New York City and Las Vegas. The Debtor provided restaurant management and support services to Plaintiffs' operations, as well as several other affiliate restaurants (collectively, the "Restaurant Affiliates")[1]. Together, the Restaurant Affiliates owned six high-end steakhouse restaurants, branded as "Strip House", located in New York ("Strip House New York"), New Jersey ("Strip House New Jersey"), Florida ("Strip House Naples" and "Strip House Key West"), Texas ("Strip House Houston") and Nevada ("Strip House Las Vegas"), as well as two catering facilities ("Bridgewaters" and "24 Fifth Avenue"), and a Michael Jordan's steakhouse ("Michael Jordan's"), all located in Manhattan (collectively, the "Restaurants"). Beginning in 2006, the Debtor and the restaurant businesses underwent a rapid expansion, with the opening of six new restaurants within a span of two years. Attendant to the expansion of the business, the Debtor and certain of the Restaurant Affiliates sought financing to consolidate their debt obligations.

Pursuant to a certain Loan and Security Agreement, dated September 19, 2007 (as modified thereafter, the "Loan and Security Agreement"), by and between GECC on the one hand, and The Glazier Group, Inc., Big Bones Limited Partnership, Big Bones Liquor, Inc., Boca Bones, LLC, Delta Dallas Alpha Corp., Fifth Avenue Ballroom LLC, Funny Bone LLC, Mathew Port, LLC, Penny Port, LLC, Strip House Las Vegas, LLC, Strip House Naples, LLC, Strip House Puerto Rico, LLC, Tapika Brands, Inc. and T-

---

[1] Together with Plaintiffs, the Restaurant Affiliates include Big Bones Limited Partnership, Big Bones Liquor, Inc., Delta Dallas Alpha Corp., Fifth Avenue Ballroom LLC, Mathew Port, LLC, Penny Port, LLC, Strip House Key West, LLC, and Strip House Naples, LLC.

3

Bone Restaurant LLC (collectively, the "Borrowing Entities"), on the other hand, GECC made a joint and several loan in the amount of $7 million (the "GECC Loan") to the Borrowing Entities as co-borrowers. The GECC Loan was secured by substantially all of assets of the Borrowing Entities, other than real property leasehold interests, together with their respective membership interests.

Section 9.4 of the Loan and Security Agreement provides that the Borrowing Entities shall pay GECC "all reasonable out-of-pocket costs and expenses, including reasonable costs and expenses for legal counsel" in connection with the following:

> (a) the investigation, interpretation or administration of any of the Loan Documents; (b) the investigation, development, preparation, negotiation, execution, interpretation or administration of (i) any amendment, extension, renewal, termination, supplement, termination, or waiver of any provision of any Loan Document; (ii) any commitment or proposal letter for any such modification or termination; (iii) any other document prepared in connection with any such modification or termination; (iv) any release or substitution of Collateral; (v) any request for Lender consent or approval to any matter; or (vi) the consummation and administration of any transaction contemplated in such modification or termination (including periodic audits in connection therewith and environmental audits and assessments); (b) internal audit reviews, field examinations, and Collateral examinations; (c) any refinancing or restructuring of the credit agreements provided pursuant to the Loan Documents in the nature of a "work-out"; (d) the enforcement or preservation of any right or remedy under any Loan Document, any other Obligation, with respect to the Collateral, or with respect to any other related right or remedy; and (e) the commencement, defense, conduct of, intervention in, or the taking of any other action with respect to, any proceeding (including any bankruptcy or insolvency proceeding) related to Borrower, any other Borrower Party, any Loan Document, or any Obligation (or the response to and preparation for any subpoena or request for document production relating thereto).

A true and correct copy of the Loan and Security Agreement is annexed hereto as <u>Exhibit "A."</u>   The Borrowing Entities later entered into two loan modifications with GECC, dated May 12, 2009 and July 1, 2009 (the "GECC Loan Modifications").   Pursuant to the GECC Loan Modifications, the Borrowing Entities pledged their equity interests to GECC, and GECC in turn agreed to a schedule of interest only payments through December 1, 2009.   Between September 2007 and November 2010, the Borrowing Entities paid down the GECC Loan by approximately $1.2 million while continuing to remain current on the GECC Loan interest payments.

In or about October 2010, the Borrowing Entities, in good faith, continued loan restructuring negotiations with GECC.   During the course of these negotiations, GECC indicated that it would not agree to any further modification of the GECC Loan unless the Borrowing Entities made a $650,000 equity infusion before December 21, 2010, and agreed to certain financial covenants and other demands, including, *inter alia*, (a) personal guarantees on the GECC Loan from the Glazier family; (b) acceleration of the GECC Loan maturity date to October 1, 2012 from October 1, 2014; and (c) a $600,000 mortgage on the Glazier family home.   When the Borrowing Entities told GECC it could not meet its onerous demands, GECC issued a default letter to the Borrowing Entities, dated November 10, 2010 (the "Default Letter"), immediately accelerating the $5,823,689.05 balance of the GECC Loan.   A true and correct copy of the Default Letter is annexed hereto as <u>Exhibit "B."</u>

**The Chapter 11 Case**

In the face of GECC's Default Letter, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for

the Southern District of New York (Case No. 10-16099) (the "Chapter 11 Case") on November 15, 2010 (the "Petition Date"). At the commencement of the Chapter 11 Case (and, indeed, throughout the Chapter 11 Case), GECC was aware that the value of the collateral securing the GECC Loan far exceeded the outstanding balance. This was confirmed by GECC's Senior Vice President David A. Burger's sworn testimony in this action:

> "…we felt that the value of the enterprise was exceeded [by] the $5.8 million [balance on the GECC Loan]. I don't remember by how much … but I do remember we felt we were adequately collateralized."

(Deposition of David A. Burger, July 9, 2012 ("Burger Dep.") at 49:13 - 49:17.). A true and correct copy of the Burger Deposition is annexed hereto as Exhibit "C."

In fact, the size of GECC's equity cushion was specifically discussed in an email from GECC's expert, John S. Kokoska of BDO Consulting Corporate Advisors, LLP, to Mr. Burger dated March 18, 2011 (the "Kokoska E-mail"). In this e-mail, Mr. Kokoska advised Mr. Burger that a sale of just five of the nine Restaurants would generate at least $15 million -- almost *three times* the amount outstanding under the GECC Loan as of the Petition Date:

> I couldn't help myself. I wanted to see what the better Glazier stores looked like. See the "winners" tab. I think we start a pool to see what these sell for. My guess is $15+.

A true and correct copy of the Kokoska E-mail is annexed hereto as Exhibit "D."[2]

Notwithstanding GECC's vastly oversecured position, GECC's singular intention from the outset of the Chapter 11 Case was to terminate its relationship with the

---

[2] Due to its voluminous nature (approx. 350 pages), the spreadsheet attached to the Kokoska E-mail is not included in Exhibit D, but is available for the Court's inspection upon request.

Borrowing Entities and achieve an immediate payout on its loan balance by forcing a sale
of the Restaurant Affiliates.  Mr. Burger conceded this point during his sworn testimony:

> MR. FRIED: It didn't really matter that you were getting
> payments that were equal to the interest of the principal
> balance on the loan, because you wanted a sale and you
> wanted your money back and you wanted out of the
> relationship with The Glazier Group; isn't that correct?
>
> MR. BURGER: Well, yes, we wanted to exit the
> relationship, but yes, I wanted to be paid in the interim
> during the intervening bankruptcy.

(Burger Dep. at 55:22 - 56:8).  GECC's forced sale agenda was also made clear in a

November 18, 2010 e-mail (the "November 18 E-mail") from Mr. Burger to a Managing

Director of GE Capital Franchise Finance.  In response to a request to meet with a party

interested in purchasing the Restaurant Affiliate assets, Mr. Burger stated, "Stay tuned.

We are going to push for a sale.  Needs to gestate for a bit.  Tell them we hope to have a

sale."  A true and correct copy of the November 18 E-mail is annexed hereto as Exhibit

"E."

That same day, the Court entered an *Interim Order Authorizing Use of Cash
Collateral* (Docket No. 18) (the "First Interim Cash Collateral Order").  A true and

correct copy of the First Interim Cash Collateral Order is annexed hereto as Exhibit "F."

Pursuant to the First Interim Cash Collateral Order, GECC was granted a post-petition

claim against the Debtor's estate as adequate protection for any diminution in the value of

GECC's collateral post-petition.  As security for the adequate protection claim, GECC

was also granted a replacement lien on all of the Debtor's property presently owned and

thereafter acquired.  As additional security for the adequate protection claim, the First

Interim Cash Collateral Order required the Debtor to provide monthly adequate

protection payments to GECC in the amount of $5,000.00. Notably, GECC did not request that the First Interim Cash Collateral Order (or any interim cash collateral order entered thereafter) require the Debtor to provide GECC with any financial reporting or financial controls.

On February 14, 2011, the Court entered a second *Interim Order Authorizing the Use of Cash Collateral* (Docket No. 69) (the "Second Interim Cash Collateral Order"), which further enhanced GECC's adequately protected position by granting GECC a perfected security interest in an approximately $750,000 receivable due to the Debtor that was not included in GECC's collateral package as of the Petition Date. A true and correct copy of the Second Interim Cash Collateral Order is annexed hereto as Exhibit "G."

On March 7, 2011, the Court entered a third *Interim Order Authorizing the Use of Cash Collateral* (Docket No. 81) (the "Third Interim Cash Collateral Order"), which further enhanced GECC's adequately protected position by increasing GECC's monthly adequate protection payments to $29,653.00, which amount was equal to the monthly interest due on the principal balance of the GECC Loan. A true and correct copy of the Third Interim Cash Collateral Order is annexed hereto as Exhibit "H."

Thereafter, the Court entered an additional seven consensual interim cash collateral orders further extending the Debtor's authorization to utilize GECC's cash collateral in the Chapter 11 Case, and preserving all the additional security and adequate protection afforded to GECC under the prior cash collateral orders. GECC received all monthly adequate protection payments required under the cash collateral orders, timely and in full.

Notwithstanding GECC's oversecured and adequately protected position in the Chapter 11 Case, GECC continued to obstruct the Debtor's reorganization efforts in its attempt to force a sale. To that end, GECC filed a motion, dated December 29, 2010, to appoint a trustee or examiner with expanded powers to oversee the sale of the Restaurants (Docket No. 33) (the "Trustee Motion"). In connection with the Trustee Motion, GECC commissioned Mr. Kokoska to prepare an expert report, dated January 6, 2011 (the "BDO Report"). The BDO Report, which was designed to support GECC's efforts to force a sale, indisputably provided misinformation to the Bankruptcy Court. A true and correct copy of the BDO Report is annexed hereto as Exhibit "I."

The thesis of the BDO Report, as highlighted in the opening sentence of the section entitled "Summary of Opinion" was that "GE Capital is no longer adequately protected." However, in his sworn deposition testimony, Mr. Burger admitted that GECC actually *was* adequately protected throughout the Chapter 11 Case:

> MR. FRIED: I'm only referring to that first sentence where he says, "As such, GE Capital is no longer adequately protected." I don't know that I got an answer and I apologize if you did. On January 6, 2011 that was not true, was it?
>
> MR. BURGER: I believe at that point that GE, at that point and throughout the case, GE was adequately protected.

(Burger Dep. at 92:10 - 92:18). Notwithstanding Mr. Burger's admission that GECC was adequately protected throughout the Chapter 11 Case, GECC knowingly submitted Mr. Kokoska's report, which was rendered pursuant to GECC's instructions, so as to construct a bogus emergency designed to garner the Bankruptcy Court's support for an immediate sale.

GECC also employed the BDO Report and its own Internal Audit to levy false accusations of massive prepetition Glazier family withdrawals from the Debtor and the Restaurant Affiliates. In order to defend itself against this baseless claim, the Debtor at great expense hired John Dunne of Renewal Ventures, LLC to serve as Chief Restructuring Officer (the "CRO") with full power to both manage and, if necessary, sell the assets of the Debtor and the Restaurant Affiliates. The Court approved Mr. Dunne's retention by Order dated February 16, 2011 (the "CRO Retention Order"). A true and correct copy of the CRO Retention Order is annexed hereto as Exhibit "J." Not surprisingly, the assertions as to the massive Glazier family withdrawals were completely debunked by the CRO's uncontradicted testimony that, for the full three year period subsequent to the GECC Loan, the Glazier family's capital infusions exceeded their capital distributions. (See January 28, 2011 Hearing Transcript at pp. 157-178) (Docket No. 83).

On or about March 2, 2011, the Borrowing Entities executed a DIP Financing/Chapter 11 Plan Funding Term Sheet with the Feil Organization Inc. (the "Plan Term Sheet"). A true and correct copy of the Plan Term Sheet is annexed hereto as Exhibit "K." As set forth in the Plan Term Sheet, the Debtor's proposed plan provided for GECC's claim to either "(a) be reinstated and rendered unimpaired, (b) receive deferred cash payments in an amount equal to the present value of the Allowed Secured Value of the Claim, (c) receive a total of cash plus all or a portion of the collateral securing its allowed Claim, or (d) such other treatment as the holder of the GECC Claim and Plan Debtor may agree." GECC received a copy of the Plan Term Sheet on March 2, 2011. At a hearing before the Court the following day, sensing that its objective to force

an immediate and full payout was in jeopardy, GECC's counsel levied the first of a series

of threats to foreclose on the Restaurant Affiliate assets outside of the Bankruptcy Court:

> The Court is clearly inclined to give Mr. Dunne yet another
> short period to try to figure out something to do. But if
> we're going to proceed on this agreement, without all the
> companies being in bankruptcy, then something concrete
> need to be presented, and nothing has been presented,
> except by us.

(March 3, 2011 Hearing Transcript at p. 96) (Docket No. 82).

Mr. Burger reiterated GECC's position in an e-mail to the Debtor's CRO, dated

March 17, 2011 (the "March 17, 2011 E-mail"). Mr. Burger admitted that GECC had

"no appetite for a partial paydown/reinstatement" of the GECC Loan, and intended to

"achieve an immediate 100% payout through any sale or plan process." A true and

correct copy of the March 17, 2011 E-mail is annexed hereto as Exhibit "L." Not

surprisingly, Mr. Burger conceded that GECC still would have objected to the plan even

if it contained the original demands GECC sought immediately prior to issuing the

Default Letter (which GECC knew the Borrowing Entities could not meet):

> MR. FRIED: Are you saying, Mr. Burger, that if the plan
> had contained some of the things you were looking for
> early on regarding equity investment, things like that, there
> was a chance you wouldn't have objected to this plan?
>
> MR. BURGER: I still think we would have objected to the
> plan...

(Burger Dep. at 67:24 - 68:7).

To that end, GECC opposed the Debtor's request for an extension of its exclusive

period to propose a plan of reorganization (the "Exclusivity Motion"), and served U.C.C.

secured party collateral sale notices upon the Restaurant Affiliates and their owners for

the sale of the Restaurant Affiliates' collateral and the sale of the owners' membership

interests (the "UCC Sales"). At a contested hearing before the Court on April 1, 2011 to consider the Exclusivity Motion (the "April 1 Hearing"), the Bankruptcy Court denied the Debtor's request to enjoin GECC from continuing with the UCC Sales, scheduled for April 15, 2011, and indicated that it would be disinclined upon further hearing to enjoin the sale of the equity interests in the Restaurant Affiliates.

At the conclusion of the April 1 Hearing, counsel for GECC requested that the Debtor and the Restaurant Affiliates, along with the CRO, counsel to the Debtor and the Glazier family, attend a meeting with Landry's Restaurants, Inc. ("Landry's"), GECC's candidate to purchase the Restaurant Affiliate assets, at the offices of Landry's counsel (the "Landry's Meeting"). At the Landry's Meeting, Landry's made a below market offer to purchase the restaurants owned by Plaintiffs (Strip House New York and Strip House Las Vegas) and Big Bones Limited Partnership (Strip House Houston). With the Landry's offer continuing to be below market, the Debtor and the Restaurant Affiliates instead sought other potential buyers and ultimately sold the Plaintiffs' restaurants and the "Strip House" trademark for $12.75 million to a third party purchaser located by the Debtor's CRO (the "Asset Sale"). The Asset Sale closed on December 6, 2011.

In conjunction with the closing of the Asset Sale, GECC issued a payoff and lien release letter to Plaintiffs, dated December 5, 2011 (the "Payoff Letter"). A true and correct copy of the Payoff Letter is annexed hereto as Exhibit "M." The Payoff Letter listed a total amount of $6,786,320.00 (the "Payoff Amount") computed as follows:

| | | |
|---|---|---|
| (a) | Principal: | $5,512,239.09 |
| (b) | Interest: | $463,021.71 |
| (c) | Late Charges: | $108,637.02 |

| | |
|---|---|
| (d) Processing Fee: | $500.00 |
| (e) BDO fees and expenses: | $162,828.18 |
| (f) Internal Audit Exam I: | $17,534.86 |
| (g) Internal Audit Exam II: | $17,706.79 |
| (h) Reed Smith LLP - fees: | $466,943.00 |
| (i) Reed Smith LLP - expenses: | $36,909.38 |

Plaintiffs immediately notified GECC that it disputed items (e) through (i) of the Payoff Amount as being unreasonable, unnecessary and excessive.[3]  GECC refused to reduce the Payoff Amount and threatened to obstruct the Plaintiffs from closing the Asset Sale unless the Payoff Amount was paid in full at the closing.  Faced with no other option, Plaintiffs paid GECC the full amount demanded under protest.

## APPLICABLE LEGAL STANDARD

Loan agreements, such as the agreement *sub judice*, frequently contain the borrower's promise to pay legal fees that a secured lender may subsequently incur in the enforcement of its rights.  In bankruptcy, it is well-settled that "such covenants will never create an unfettered entitlement to recover the costs and expenses of counsel.  Rather, section 506(b) of the Bankruptcy Code imposes the further requirement of reasonableness."  In re Amherst Orthopedic Associates, P.C., 355 B.R. 420, 420 (Bankr. W.D.N.Y. 2006).

---

[3] On August 16, 2011, the Debtor filed an objection (the "Claim Objection") to GECC's proof of claim in the Chapter 11 Case alleging that the fees, charges and expenses being sought were unreasonable (Docket No. 158).  Thereafter, GECC informed the Debtor that it would seek to convert the Chapter 11 Case unless the Claim Objection was withdrawn.  The Debtor agreed to withdraw the Claim Objection, without prejudice, with an attendant promise from GECC to negotiate the issue in good faith.  The Order confirming the Debtor's plan of reorganization (Docket No. 258) specifically reserved the Plaintiffs' right to bring this action.

Section 506(b) of the Bankruptcy Code sets the controlling standard for the allowance of legal expenses incurred on behalf of a secured lender. This section states, in pertinent part:

> To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any *reasonable* fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b) (emphasis added). In order to recoup post-petition fees and expenses under this section, a creditor must prove (1) it is the holder of a secured claim, (2) the secured claim is oversecured, (3) the agreement between the parties provides for the fees, and (4) the fees sought are reasonable.[4] In re McKenna, 362 B.R. 852, 857 (Bankr. N.D. Ohio 2006). Accordingly, under section 506(b), "the holder of an oversecured claim shall be allowed any *reasonable* fees, costs, or charges provided for under the agreement or State statute under which such claim arose." In re Scarlet Hotels, LLC 392 B.R. 698, 702 (6th Cir. 2008) (emphasis added).

It is equally well-settled that this section does not provide oversecured creditors with a "blank check" to run up fees and expenses without regard to any limits. Id.; see also In re Latshaw Drilling, LLC, 481 B.R. 765, 798 (Bankr. N.D. Okla. 2012) ("Section 506(b) does not provide an oversecured creditor with a 'blank check' to act without regard to the reasonableness of strategies or positions taken, of time spent, or of the number of lawyers engaged); In re Good, 207 B.R. 686, 689 (Bankr. D. Idaho 1997) ("[A] Court must view a creditor's decisions objectively to see that an oversecured creditor is not given a blank check to incur fees and costs which will automatically be

---

[4] As set forth above, the sole issue in this case is whether the post-petition fees and expenses sought by GECC are reasonable.

reimbursed out of its collateral.") (internal quotations and citation omitted); In re Ward, 190 B.R. 242, 250 (Bankr. D. Md. 1995) ("Courts interpreting this section have made clear that § 506(b) does not provide an uninhibited mechanism for an oversecured creditor to obtain fees and expenses for its counsel to make up for unrelated, uncompensated or undercompensated work.").

Instead, "a rule of reason must be observed, in order to avoid such clauses becoming a tool for wasteful diversion of an estate at the hands of secured creditors who, knowing that the estate must foot the bills, fail to exercise restraint." In re Latshaw Drilling, LLC, 481 B.R. at 798; In re Continental Vending Machine Corp., 543 F.2d 986, 994 (2d Cir. 1976) (same); see also In re Adelphia Communications Corp., 368 B.R. 140, 279 (Bankr. S.D.N.Y. 2007) ("Section 506(b) of the Bankruptcy Code limits oversecured lenders' claims for fees and costs to an amount sufficient to pay 'reasonable' expenses— not just any amount that the banks happen to incur and submit for repayment.").

Importantly, the issue of whether fees are reasonable is an objective standard, rather than a subjective one. Id. Otherwise, "parties could run up legal fees and waste estate funds that would otherwise be distributed." Id.; see also In re Dalessio, 74 B.R. 721, 723 (9th Cir. BAP 1987) ("A court should not reward a creditor whose overly aggressive attorney harasses and opposes the debtor at every stage of the bankruptcy proceeding, nor should an oversecured creditor be given a blank check to incur fees and costs which will automatically be reimbursed out of its collateral."); In re Mills, 77 B.R. 413, 420 (Bankr.S.D.N.Y.1987) ("'It is inherently unreasonable ... to ask a debtor to reimburse attorneys' fees incurred by a creditor that are not cost-justified either by the economics of the situation or necessary to preservation of the creditor's interest in light of

15

the legal issues involved.'") quoting Matter of Nicfur–Cruz Realty Corp., 50 B.R. 162,

169 (Bankr. S.D.N.Y. 1985); In re Reorganized Lake Diamond Associates, LLC, 367

B.R. 858 (Bankr. M.D. Fla. 2007) ("a secured creditor is not entitled to compensation for

its attorneys' fees for every action it takes by claiming that its rights have been effected.")

(internal citations omitted).

The restraint imposed on oversecured creditors under section 506(b) works in

conjunction with the overall purpose of the Bankruptcy Code -- to permit an honest

debtor with a chance to reorganize its affairs.   As summarized by the court in In re

McKenna:

> Creditors, while understandably not pleased with the
> burdens imposed by bankruptcy, are expected to give an
> honest debtor seeking to reorganize their financial affairs
> the chance to get back on their feet. This does not mean
> that a creditor is not entitled to be reimbursed for legal
> costs incurred to properly monitor the case, with such
> charges generally allowed as a matter of course. But when
> a creditor's interest is not seriously in jeopardy, restraint
> should be exercised, especially during the initial stages of
> the case.

362 B.R. at 859 (internal citations omitted).

Creditors are clearly entitled to engage counsel and pay for constant and

aggressive representation, but "where services are not reasonably necessary or action is

taken because of an attorney's excessive caution or overzealous advocacy, courts have

the right and duty, in the exercise of discretion, to disallow fees under [section] 506(b)."

In re Latshaw Drilling, LLC, 481 B.R. at 805, citing In re Wonder Corp. of America, 72

B.R. 580, 591 (Bankr. D. Conn. 1987).   Thus, "[w]hen the creditor's secured position is

jeopardized, it may be necessary to participate broadly in the bankruptcy process. But

when the creditor is minimally at risk, circumstances will generally require that counsel

respond only to issues of material concern, such as the establishment of a process for monitoring current levels of collateral." In re Amherst Orthopedic Associates, P.C., 355 B.R. at 424 (internal citations omitted).

Accordingly, the size of a creditor's equity cushion is a key factor in determining the reasonableness of a secured creditor's actions in a bankruptcy case. In re PCH Associates, 122 B.R. 181, 203 (Bankr. S.D.N.Y. 1990); In re Amherst Orthopedic Associates, P.C., 355 B.R. at 423; In re Latshaw Drilling, LLC, 481 B.R. at 805. "If the equity cushion is large enough that there is no appreciable risk that a creditor will not be paid, courts will tend to view large fee claims as being exorbitant because there is no purpose in engaging in legal maneuvers." Id., citing In re PCH Assoc., 122 B.R. at 203.

Indeed, courts are keenly aware of the tendency of oversecured creditors to incur unreasonable costs during the pendency of a bankruptcy case:

> Most people see a cow and hear "moo". Oversecured creditors see a cash-cow and hear "moola". The view that an oversecured creditor can incur legal expenses with impunity in the expectation that its collateral will cover such costs is detrimental to the remedial goals of, and the possibilities of success in, a Chapter 11 proceeding.

In re Irick, 216 B.R. 433, 435 (Bankr. E.D. Cal. 1997); see also In re Reorganized Lake Diamond Associates, LLC, 367 B.R. at 871 ("In such situations, where the creditor is assured of recovering its investment, there is an even greater tendency of the creditor to aggressively litigate and incur additional costs."); In re Lederman Enters., Inc., 106 B.R. 674, 679 (Bankr.D.Colo.1989) ("[W]here a lender is assured of being repaid not only principal and interest but also all costs of collection which it might incur in chasing the debtor, there is a risk that the lender will permit or encourage its counsel to proceed with collection efforts with unbridled zeal."). Thus, "[a] creditor who fails to heed § 506(b)'s

warning that only reasonable costs can be recovered does so at substantial risk." In re Irick, 216 B.R. at 435.

## ANALYSIS

The size of GECC's equity cushion substantially limited the range of actions for which GECC can seek reimbursement in the Chapter 11 Case. As of the Petition Date, the outstanding balance on the GECC Loan was approximately $5,823,689.05. As admitted by Mr. Burger, GECC was at all times aware "that the value of the enterprise was exceeded [by] the $5.8 million" balance on the GECC Loan, and that GECC was "adequately collateralized." Indeed, GECC's own expert privately projected that a sale of just five of the nine Restaurants (excluding intellectual property) would fetch upwards of $15 million -- nearly *three times* the amount of the outstanding balance of the GECC Loan. In reality, the Plaintiffs sold just two Restaurants pursuant to the Asset Sale for approximately $12 million -- *more than twice* the amount of the outstanding balance of the GECC Loan as of the Petition Date.

Given an equity cushion of this size, GECC could not objectively believe that its secured position was in danger. Indeed, as Mr. Burger's testimony make clear, GECC did not even *subjectively* believe its secured position was in danger. Accordingly, since GECC faced no real risk of loss, it was "required to exercise appropriate circumspection before incurring any legal costs." In re Amherst Orthopedic Associates, P.C., 355 B.R. at 423-24; see also In re Latshaw Drilling, LLC, 481 B.R. at 805; In re Scarlet Hotels, LLC 392 B.R. at 702; In re McKenna, 362 B.R. at 859.

In addition to being safely oversecured, GECC's secured position was also adequately protected throughout the Chapter 11 Case. The First Interim Cash Collateral

Order, entered at the outset of the Chapter 11 Case, granted GECC a post-petition claim against the Debtor's estate as adequate protection for any diminution in the value of GECC's collateral post-petition. As security for the adequate protection claim, GECC was also granted a replacement lien on all of the Debtor's property presently owned and thereafter acquired. As additional security for the adequate protection claim, the First Interim Cash Collateral Order required the Debtor to provide monthly adequate protection payments to GECC in the amount of $5,000.00, all of which were received by GECC.

The Second Interim Cash Collateral Order further enhanced GECC's adequately protected position by granting GECC a perfected security interest in an approximately $750,000 receivable due to the Debtor that was not included in GECC's collateral package as of the Petition Date.

The Third Interim Cash Collateral Order enhanced GECC's adequately protected position even further by increasing GECC's monthly adequate protection payments to $29,653.00 -- the amount of monthly interest due on the principal balance of the GECC Loan. All of those adequate protection payments were received by GECC, as well. Thereafter, the Court entered an additional seven interim cash collateral orders _on a consensual basis_ further extending the Debtor's authorization to utilize GECC's cash collateral in the Chapter 11 Case, and preserving all the additional security and adequate protection afforded to GECC under the prior cash collateral orders.

Notably, if GECC ever truly felt that its secured position was in danger or not being adequately protected in the Chapter 11 Case, GECC could have withheld its consent to use cash collateral or required the Debtor to provide GECC with some form of

financial reporting or financial controls, as typically done by secured lenders in bankruptcy cases. GECC did not see fit to take any of those precautions because, as Mr. Burger explained, GECC knew that its secured position was adequately protected throughout the Chapter 11 Case. (Burger Dep. at 92:16 - 92:18).

The material facts in this case are nearly identical to In re Amherst Orthopedic Associates, P.C., supra. In Amherst Orthopedic, the debtor was party to a prepetition loan agreement that provided for the reimbursement of the lender's reasonable fees and expenses. As of the date of the bankruptcy filing, the secured lender's claim was secured by collateral having a value "far in excess of the outstanding obligation." At the outset of the case, the debtor and its secured lender stipulated to the entry of an order allowing the use of cash collateral in accordance with the terms of an agreed budget. The cash collateral order also gave the secured lender a replacement lien on all assets acquired post-petition, and directed the resumption of payments of principal and interest under the loan agreement. The court extended the use of cash collateral from time to time during the case, and the debtor made all required adequate protection payments. 355 B.R. at 421-23.

Despite these protections, the secured lender engaged in an aggressive course of action during the bankruptcy case, including attendance at creditor meetings, responding to motions not concerning the lender, supporting a motion to convert and other actions having a tangential relationship to the lender's secured interest. The debtor eventually made a lump sum payment to the lender representing the unpaid balance on the loan, but refused to pay the lender's requested reimbursement of legal fees and expenses incurred during the debtor's bankruptcy case. Id. at 424-27.

The Amherst Orthopedic court held that the lender's reimbursement request was unreasonable, finding that "at all times during this bankruptcy proceeding, [the lender] faced no real risk of loss." Id. at 423. Therefore, to the extent it wished reimbursement, the lender was required to "exercise appropriate circumspection before incurring any legal costs." Id. at 423-24. In finding the lender's actions to be unreasonable, the court paid special attention to the protections afforded to the lender under the cash collateral orders, noting that "despite the entry of a cash collateral order that fully protected its client's amply secured position, counsel undertook tasks that were not necessary for the protection of its client's interests." Id. at 424.

Similarly here, GECC was vastly oversecured and adequately protected throughout the Chapter 11 Case. Notwithstanding these facts, GECC's legal bills (true and correct copies of which are annexed hereto as Exhibit "N") highlight a multitude of actions taken by GECC during the Chapter 11 Case that bear no relation to the protection of GECC's secured position, which GECC admits was never in danger:

a) **Discovery/Depositions**: approximately $80,430 in fees incurred in connection with multiple discovery demands on the Debtor and depositions of Peter H. Glazier (CEO), Mathew Glazier (President/General Counsel), Lois Penny Glazier (Marketing), Walter Perkowetz (COO) and William Duffy (ex-CFO) in order to support GECC's effort to appoint a trustee;

b) **Trustee Motion**: approximately $98,810 in fees incurred in connection with the Trustee Motion, including fees related to preparing the BDO Report and supplements thereto;

c) **Exclusivity Motion**:  approximately $48,840 in fees incurred in connection with opposing the Exclusivity Motion;

d) **Sale Efforts**:  approximately $68,875 in fees incurred in connection with GECC's effort to sell the Borrowing Entities' assets, including approximately $37,345 in fees incurred after the Debtor began negotiations with Landry's;

e) **Plan and Disclosure Statement**:  approximately $4,860 in fees incurred in connection with GECC's review of the Debtor's plan and disclosure statement, including fees associated with researching and drafting an objection to the disclosure statement which was never filed;

f) **Motions Unrelated to GECC**:  approximately $9,420 in fees incurred in connection with reviewing and/or objecting to motions unrelated to GECC, including the Debtor's motion to approve a tax settlement with the State of New York ($6,840), the Debtor's motion to approve a PACA settlement ($1,020), and various claim objections, settlement motions and retention applications ($1,560);

g) **341 Meeting**:  approximately $1,230 in fees incurred in connection with attending, summarizing and discussing the Debtor's meeting of creditors under section 341 of the Bankruptcy Code;

h) **Discussions with Licensor**:  approximately $3,150 in fees incurred in connection with discussions with the licensor of the Michael Jordan's Steakhouse;

i) **Redacted Time Entries**:  approximately $31,620 in unspecified fees have been redacted from the GECC legal bills.

As these time entries demonstrate, GECC spent the majority of its time overzealously stonewalling the Debtor's legitimate reorganization efforts in order to pursue its plan to force a sale and achieve an immediate 100% payout.

At the outset of the Chapter 11 Case, GECC spent a considerable amount of time and resources attempting to manufacture a basis for the appointment of a trustee. To that end, GECC engaged in extensive and intrusive discovery of the Debtor, and deposed every single officer, director and/or principal of the enterprise. In addition, GECC engaged their internal auditors to perform an entirely redundant and unnecessary "Internal Audit Exam II" in order to drudge up support for GECC's intended Trustee Motion. The result of this second "audit" was an affidavit from Cesar Valenzuela, a GECC employee, purporting to show massive Glazier family withdrawals from the Borrowing Entities (the "Valenzuela Affidavit"). GECC then filed the Trustee Motion and, along with it, the erroneous Valenzuela Affidavit and the blatantly false BDO Report purporting to show that "GE Capital is no longer adequately protected."

None of these efforts were geared towards the protection of GECC's secured position. Indeed, GECC already knew it was oversecured and adequately protected at the outset of the Chapter 11 Case. Moreover, the unreasonableness of these efforts is exacerbated by GECC's admission that the central thesis of the BDO Report used to support its forced sale agenda is entirely false. (See Burger Dep. at 92:16 - 92:18). Mr. Kokoska himself tacitly acknowledged the falsity of his own report in his analysis to Mr. Burger projecting that a sale of just five of the Restaurants would net more than $15 million. Moreover, as a result of GECC's wanton disregard for the accuracy of the Valenzuela Affidavit and the BDO Report, the Debtor was forced to hire a CRO who

further discredited the assertions regarding Glazier family withdrawals from the Restaurant Affiliates. Accordingly, all of the above-mentioned fees and expenses attributable to the Trustee Motion, including BDO's fees and expenses in the amount of $162,828.18 and the Internal Audit Exam II fees in the amount of $17,706.79, were unreasonably incurred solely to force an early termination of GECC's relationship with the Borrowing Entities and were unnecessary to protect GECC's secured position.

GECC also adamantly opposed the Debtor's attempt to propose a plan of reorganization -- even though that plan provided for GECC's claim to be rendered unimpaired. Indeed, GECC openly admits that it would have opposed _any_ plan proposed by the Debtor that did not provide for an immediate 100% payout (even though the GECC Loan did not mature until 2014). (See Burger Dep. at 67:24 - 68:7). When the Debtor refused to back down, GECC opposed the Debtor's Exclusivity Motion and threatened to foreclose on the Restaurant Affiliates outside the purview of the Bankruptcy Court. As an adequately protected and oversecured creditor, GECC's intransigence in opposing a plan that would have rendered its claim unimpaired (or any plan that did not provide for a full and immediate payout) is also unreasonable within the meaning of section 506(b) of the Bankruptcy Code. See In re Latshaw Drilling, LLC, 481 B.R. 765 (finding oversecured secured creditor's effort to oppose the debtor's plan, which proposed to pay the secured creditor in full, was unnecessary to protect its rights and therefore not reasonable); see also In re Reorganized Lake Diamond Associates, LLC, 376 B.R. at 871 ("[oversecured party's] involvement in the case more effectively stonewalled Debtor's licit efforts at reorganization than facilitated it. In fact, not only were [oversecured party's] actions disruptive, but their involvement actually increased

the costs of the Chapter 11 Case because the Debtor had to respond to all of the unnecessary litigation foisted upon it.").

Even when the Borrowing Entities ultimately acquiesced to GECC's forced sale effort, GECC continued to actively participate in the sale process despite its significant equity cushion. The unnecessary nature of these services is only compounded by the fact that GECC wasted significant time and resources unsuccessfully pushing for a below market sale to Landry's, while the Plaintiffs ultimately sold their assets to an entity located by the CRO.

GECC was entitled to pursue an aggressive course of action in the Chapter 11 Case in order to achieve its stated goal of an immediate 100% payout. However, it is not reasonable to require the Plaintiffs to foot the bill when, by GECC's own admission, it was at all times oversecured and it was never in danger of not being paid in full. See e.g., In re PCH Associates, 122 B.R. at 203; In re McKenna, 362 B.R. at 859. Accordingly, GECC was required to "exercise appropriate circumspection before incurring any legal costs." In re Amherst Orthopedic Associates, P.C., 355 B.R. at 423-24. Instead, GECC chose to pursue an overly aggressive agenda, not because its secured position was in jeopardy, but merely because it no longer wanted to be in business with the Borrowing Entities. That was GECC's prerogative, but it falls well short of the reasonableness standard imposed under the Bankruptcy Code, and GECC is not entitled to be reimbursed for it. Accordingly, all fees and expenses incurred by GECC in the Chapter 11 Case, beyond securing adequate protection through the entry of the cash collateral orders, should be deemed unreasonable and reimbursed to the Plaintiffs.

25

## CONCLUSION

For all of the foregoing reasons, Plaintiffs are entitled to a judgment (i) declaring GECC's fees and expenses incurred during the Chapter 11 Case unreasonable, in an amount to be determined at trial, but in no event less than $564,679.35, (ii) reimbursing Plaintiffs the full amount of unreasonable fees and expenses paid to GECC, and (iii) granting such other and further relief may deem just and proper together with the costs and disbursements of this proceeding.

Dated: New York, New York
      January 15, 2013

HERRICK, FEINSTEIN LLP

_____
William R. Fried (*wfried@herrick.com*)
Joshua J. Angel (*jangel@herrick.com*)
Justin B. Singer (*jsinger@herrick.com*)
2 Park Avenue
New York, NY 10016
212.592.1400
*Attorneys for Plaintiffs T-Bone Restaurant LLC
and Strip House Las Vegas, LLC and Third-Party
Defendant The Glazier Group, Inc.*